We're ready for you, Counsel. I'll try to reserve about five minutes for rebuttal. I have just a few sentences, about four or five issues, and then whatever questions the court has. As I understand it, he's not claiming total disability because of a psychiatric disability. Is that right? No, sir. I think he's claiming disability because of physical only. He did have depression secondary to the chronic condition. I know he had the depression. That's why I asked you. No, sir. Not claiming that at all. Okay. Now, on the physical disability, I didn't see an MRI in here, and I was real curious to read an MRI. There are doctor's reports that refer, I think, to an MRI and an X-ray. I don't know if they're in the executive record. But the termination letter refers to either an X-ray or an MRI, Your Honor. MRI is a lot fancier than an X-ray. An MRI, a layman can read. They're really obvious. I understand, Your Honor. X-ray is like looking at shadows on the sidewalk. It takes a radiologist to read it. One of the reports refers to an objective test. I just wanted an excerpt page if you had the MRI. There's no MRI in the record or MRI report. However, Your Honor, I don't think the definition of medical evidence in the plan requires an MRI. Well, no, it doesn't. Okay. It doesn't. Here's my problem with this. Yes, sir. Okay. You've got plainly discretionary plan language. The judge says there's no conflict of interest because the plan administrator gets paid the same, whether they say yes or no to a claim. I don't know if that's correct, Your Honor, but if I can, I'll reserve that until later because I want to answer your question. Am I wrong on one of those two things? Well, sir, I think in the concurrence in Abatey, there was a comment that said essentially having a contract, that there's incentive enough in having a contract and in securing contracts to make the claim. You're talking about my separate opinion in Abatey? Yes, sir. I didn't succeed in selling it. I understand that, Your Honor. The NARD court also said that a peer review doctor could be biased by such a contract. Abatey was a lot softer than I wanted to be on discretionary language. But we believe we should win on the, you know, if it's an abuse of discretion and on the disability issues as they are, Your Honor. So I don't want to take up your time. I was going to be a lot tougher on companies if they claimed discretionary language but couldn't sell it. So I thought, yeah, the real part is whether you've got your total disability. And when I read what you had here in medicals, it looked like he obviously had depression and it was serious. But he's not making a psychiatric claim. Yes, sir. And his physical claim, it looked like he can work, he can work part-time, he's got neck, arm, and wrist pain when he uses the computer, he needs to stand up for a few minutes every hour. Well, sir, I think it's much more serious than that. Dr. Miller said that he could not use his left arm at all in keyboarding and his right arm only 20 minutes an hour. Dr. Miller says he can't compete. VPA ignored that opinion completely. Ms. Heide said he was too disabled to even take an FCE or vocational evaluation. That report was ignored and dismissed with a. When you say ignored, do you mean not read or do you mean that the administrator decided that they didn't believe it? Mr. Graber submitted it, and the report clearly said that he was not medically able to take a vocational. But the administrator's not required to accept everything that the plaintiff's claimants' submissions would. The plaintiff, VPA, did not review it. They just said there was a phrase in it that said you do not feel that Mr. Graber doesn't feel medically ready to participate in vocational rehab or to take a test now. And they said since Mr. Graber doesn't feel like it, that doesn't mean you can't do it. Therefore, they dismissed it without dealing with the report at all, Your Honor. And the report also said that they were going to do an FCE in six months, which would determine whether Mr. Graber was totally disabled. They did it. He could only complete four hours of the first day, an hour of the second, and 15 minutes of the third day. VPA knew that was coming and did not wait on it, even though Ms. Kennedy and Ms. Lurie both said in the notice that an FCE was needed. So they essentially ignored it. They didn't discuss Dr. Miller's report at all, dismissed Ms. Heidi's report just with a flippant remark. Well, look, it looks when I read these reports like his symptoms vary from time to time, as degenerative diseases of the aging process typically do. And, gee, some of them don't look very bad. Like this report from the Santa Rosa Orthopedic Medical Group, Dr. Siebert, his range of motion is pretty good. He has pain. He's discouraged because he can't enjoy his hobbies, has some bilateral shoulder pain. Elbows have full range of motion, no epicondyle or tender. It goes like that. No epicondyle or tenderness. Cubital tunnel provocative is negative. It goes back and forth, as you'd expect with degenerative diseases. 64 was 1996, Your Honor. Pardon? 64 was 1996. Drew? That shows the first start of the disability. The doctors who treated him in 2001 and 2002 when he became disabled were Ms. Dubinsky, who said he cannot compete in the open labor market. She gave him trial employment of only 18 hours per week with tremendous restrictions and continued a permanent accommodation of voice-activated software. But you don't get the same weight for the treating physician in ERISA that you do in Social Security under the Supreme Court's decision. I understand, Your Honor, but there's no evidence on the other side at all that he can work. They instructed Dr. Kaplan, their peer review doctor, not to opine on whether Mr. Graber could work. We have Dr. Middle saying he can't compete in the open labor market. Mr. Dubinsky saying he can't compete in the open labor market. Ms. Heidi saying he can't even take an FCE, he's too disabled. This is in 2002. This 1996 was just a show when it started. This has nothing to do with when he went out. The medical evidence when he went out is very serious. And he had two trials. He left work on two trials in 2001, and he had to quit because he was in pain and could not use a computer at all. He failed to do those trials. Your Honor, also, there's no question he was too disabled to do anything. When I look at this report of the doctor that Linda Heidi referred him to, Chelsea Richardson, North Coast Evaluation Services, it's ER 198. Yes, sir. It's not real important. It's just kind of a typical one of these reports. And it reads like somebody who has some physical problems and a very bad case of depression. And, frankly, I'd wonder about somebody like this being able to function without SSRIs. But all of the physical symptoms are totally subjective. There's no objective backup form. Well, Your Honor, I think SAFON held, and a number of other circuits have held, that when you have chronic pain syndrome, which is what Mr. Graber was diagnosed with, you can't require objective evidence. And she's his treating doctor. She determined from the pain that he couldn't work. And Dr. It may be like instead of referring him to an acupuncturist and yoga, she should have referred him to a psychiatrist. No, sir, I don't think so. I think he was physically disabled. And I don't think that's the issue, Your Honor. The issue here is whether I thought whether being returned to work part-time negated total disability. And on the planet, it's not. Everybody says the same thing. Like this report we were just talking about conveyed an overall aura of defeat, fatigue, inability, and disability. Yes, sir. Well, if you look at Ms. DeBesky's reports in late 2001 and 2000, she diagnoses radiculopathy. She's L4, L5 radiculopathy, which Mr. Waxman also did, which either an MRI or an X-ray showed. And that's either it's mentioned in either the termination letter or the appeal denial letter. He finds objective evidence for both shoulder pains, all the upper extremity stuff, for his back problems as well as some leg problems. And he says he cannot work. He cannot use his arms, his upper extremities to type or for fine manipulation. He's a neurologist. Ms. Heidi is a vocational person. Well, essentially, Your Honor, Dr. Miller said he couldn't use his left hand for typing. He had very limited use of the right hand, numerous restrictions in the upper arms, restrictions against bending, twisting, fine manipulation. This is a very extensive report. Jack Miller, July 16, 2002 on ER139, Your Honor. And Mr. Binsky has reports in January 2002 and March 2002, since he was found with a brachial neuritis, chronic pain syndrome. Mr. Graber can't use it, essentially can't use a typewriter at all, can't use a computer at all. And he's an engineer. And without being able to use that computer, he can't be an engineer. Why can't he use the computer? He has brachial neuritis, Your Honor, which is sometimes called thoracicalis syndrome, which it's sometimes misdiagnosed as carpal tunnel syndrome. And it many times goes with it. It's repetitive stress injury. And it comes from neurogenic damage to arms and to nerves inside below the sternum, as well as sometimes vascular damage. How about the technology where you can dictate into the computer? Sir, he tried that twice. And she prescribed that as an accommodation. It did not work for an engineering job. It was too slow and too cumbersome to do the sort of work an engineer has to do on a computer, to use design software, CAD software, that sort of stuff. It just doesn't work. And I've tried it, Your Honor. I can't make it work. I don't know anybody who can. And essentially my doctor uses it. Well, you can use it to dictate a rough draft of a report or even a rough report, but you can't revise briefs. I would be so much more comfortable if I was reading an MRI. You know, this Dr. Dubinsky, she's an orthopedic surgeon who sends him for yoga and acupuncture, but not to a psychiatrist, even though he has obvious severe symptoms of psychiatric illness. And then she treats him with herbs. Your Honor, he's also seen a neurologist. Age 141 and acupuncture. He's also seen a neurologist at the time. I mean, I can see why an administrator of a plan might just be a little skeptical of Dr. Dubinsky. They didn't deny the claim based on that, Your Honor. As a matter of fact, they didn't deny the claim based on the fact that they thought he wasn't disabled and he was imagining things. They denied the claim based on the fact solely that he had gone back to work for 20 hours a week subject to accommodations. And anything else really should not be an issue. It's a post hoc rationale. They didn't say he couldn't work. They never denied that he could not work. Let me ask you. So I don't think it's relevant here, Your Honor. Let me ask you a couple of questions. I appreciate that you're going on the abuse of discretion. Did I understand you right that you're really not going forward on the idea that it shouldn't have been a discretionary decision? I don't understand your question, Your Honor. Well, as I understand it, the district court reviewed this on an abuse of discretion. The ERISA plan said that the claims administrator had the discretion to determine the eligibility. And as I understood your first answer to these questions, you really didn't want to talk about that issue anymore. You're giving that up. Well, I'm not giving it up, Your Honor, because I think if you look at it. I mean, the language is clear in the plan. There's no exclusive authority to construe plan in terms of final authority because they have to ask. I don't find anything in that language that says that the claims administrator didn't have the discretion to determine the eligibility. Your Honor, I don't think it's worth the court's while or my while to argue that issue. All right. And you're also suggesting, then, that the district court could have reviewed this on an abuse of discretion review? You're not arguing that either? You're not suggesting here there was a conflict of interest that would change the abuse of discretion review? I think, Your Honor, I do. And I think for this reason. VPA works so closely with centralized disability services management inside Agilent. But that isn't under our. That might be my good colleague's good dissent there. But that has nothing to do with what the decision said, correct? It's another form of conflict because their goal. Do you find any case law that backs you up on that? I think abating is the only case. And that was my good colleague's good dissent. That's your best evidence? My concern, Your Honor, and I'm going to drop it after this. My concern is that VPA's website materials say the national average of disability costs is 6% to 10% of payroll. The VPA Agilent team has succeeded in reducing that to less than 1%. All right. Now, that's. The next issue you've got in front of us is did the district court abuse its discretion by refusing to expand the administrative record? I don't even find that in your opening brief. I think it is, Your Honor. I think I mentioned all of the. Where is it? Where did you argue it? I saw one phrase one time at the top. I never saw any argument whatsoever. I argued that I had submitted numerous places in the brief. No. Point me to one where you make this argument. I make the argument that I submitted affidavits, Your Honor. Well, I guess you point me to one in your brief. I'm pretty big on looking at record and what you've said. And I didn't find anything about abuse of discretion on refusing to expand the administrative record except at the first. It's an issue. Nothing else. I think I say in there that with respect to, for example. Where is it? Give me a page. I'll look for it. It relates to accepting the affidavits of Dr. Dubinsky and Ms. Heidi and Ms. Kelsey with respect to what they would have said if they had been consulted. I'll look hard for that. Okay. Next one is they declined to impose penalties in violation of the ERISA requirements. Again, it's an abuse of discretion, isn't it? Yes, sir. And as I read this record, I can't tell. It seems to me you got your stuff. Well, we got it almost a year after. Didn't you get it? A year after we asked. Did you make any motions after you got it? Trying to help yourself, saying I need some time, I need to do what I've got to do in order to prepare? Your Honor, we did ask for continuances, and we got them. But, Your Honor, the penalties go from the first time you ask for them in a letter, not from after the litigation started. Well, I mean, my worry is it's an abuse of discretion. And it seems to me that this record supports the district court's conclusion that the claims administrator made a good faith effort to produce the required documents. All I've got to find is a discretionary call here. And if he can find the documents were produced, and we've got one side saying I gave them everything, in fact, more than they wanted, and then something didn't come up, and so they said, okay, we even send that. The record seems to support it on an abuse of discretion standard. Give me something that says it doesn't. That is not my main concern here today, Your Honor. My main concern is the benefits. Okay, so you're really saying the sufficiency of evidence on an abuse of discretion standard is where you're hanging your hat? Well, I'm saying, Your Honor, that's really what we're talking about, because you've been arguing that with my good colleague, or at least responding to his good questions for quite a while here. But we're really talking about sufficiency of evidence to sustain the district court's decision, which sustained the administrator's decision. That's what we're talking about. Your Honor, I thought this was de novo in this court. Why is it de novo? The district court has to do it on an abuse of discretion. We reviewed the district court, de novo, not the administrator. Oh, I understand, sir. But they did not specify they did not deny this claim based on the fact that the evidence was insufficient. They denied it based on the fact that he had gone back to work part-time under what they said were prescribed accommodations. That's the only reason they denied this claim. You better save a few seconds here. Okay. My time is almost up. I will save it. Thank you, counsel. The first point that I was my name is Andrew Sullivan on behalf of the appellees. Counsel, the way it looked to me was the man had a disabling psychiatric disease, but the claim is not based on it. Am I right so far? I think you're right so far, yes. It looks like it's physical diseases. It's mostly degenerative stuff that everybody gets with aging, in some respects worse, in some respects not, than other men his age or thereabouts. Is that right? I think you're right. And he had some MRIs that showed some problems that were later corrected by surgery. Is that right? Correct. And are there any MRIs that show continuing disabling conditions subsequent to the surgeries? There are not. And I think that the point that you make is a good one, is that initially the definition of total disability is a usual occupation standard. So for the first 52 weeks, the question is whether or not Mr. Graber can perform his own job. That takes us from April 2000 until about April 2001. After 52 weeks, the question is whether or not Mr. Graber can perform any occupation for which he is qualified for by reason of his education or his experience or his training. At the end of the April 2001, where the definition was about to change, Mr. Graber was getting ready to undergo surgery. He had three surgeries from May 2001 through October of 2001. And during that time, VPA listened to his doctor and they said, you know what, when you're out undergoing these surgeries, we agree that you're not going to be able to perform any occupation. Let me ask you something backing up to what you said a minute ago. Sure. I had a high school teacher of physics who was an engineer, never touched a keyboard, of course. She was a high school teacher. And they didn't have computers then anyway. Would that be one of the kinds of jobs that Mr. Graber would have to show he could not do after 52 weeks? Well, it's interesting that you mention the teaching, because the record actually contains a discussion with Mr. Graber where he says, well, I don't want to teach. And it goes to this idea. If you want to, it doesn't matter. Exactly. I think of my teachers, they would stand up when they wanted, sit down when they wanted, use a blackboard or not as they wanted, pretty much control. I think that you're absolutely correct. And the idea is that there's a distinction between Mr. Graber's job at Agilent, working as an engineer, using the computer as much as he was, and then any other occupation. Is something like teaching engineering, teaching physics, one of the occupations that would fall within what he has to be unable to do after 52 weeks? I think it would. Is there proof that he couldn't do it? I don't think that there is any proof that he couldn't perform teaching other than in the record. He says that it's not something that he would want to do. I think his argument was that he wasn't qualified to do it, but certainly his experience and his education, I think, dispels that. And ultimately what VPA did was it looked to the restrictions that were placed on Mr. Graber after he had recovered from the surgeries, looking to that voice activation software, examining the flexibility that that would provide him in any occupation scenario. What other kinds of occupations? Engineer sitting at a keyboard and working his CAD design program, that's one thing. But after 52 weeks, you look a whole lot more broadly at doing the same kind of thing he used to do. What other kinds of occupations were considered? Well, the VPA retained a vocational assessment performed by Corvell, and I think product engineer. There were three different positions that were identified and that were referenced in both the initial and the final denial letters. And there is a vocational report by Corvell which identifies, given the restrictions and limitations that Mr. Graber had following the three surgeries, three positions within his local area that he could perform. And what were they? If you give me a second, I can. An ER number like your adversary gave, that's always real helpful. I can give that to you in one second. The supplemental excerpts of record 216 and 217, and the three positions were planning engineer, procurement engineer, and logistics engineer. And that's the Corvell report. And the Corvell, what they did was they took the restrictions and limitations that Mr. Graber had, they accepted them as true, and then they were still able to go out and find positions where there were more limited computer use and that would allow him to perform another occupation. And that's been one of our main focuses, is that there is a key distinction in the plan under the plan terms about the standard prior to 52 weeks and after 52 weeks. And I know that mental illness was something that you mentioned, and it certainly does appear that Mr. Graber has depression, and you see that a number of times in the record. And I would just mention that one of the limitations after the 52-week usual occupation period is that the plan doesn't cover mental illness, and so that's perhaps why. Is that why it's not a psychiatric claim? That's why it can't be a psychiatric claim. That looked like a terrific claim to me, really. Even if it were a psychiatric claim, that wouldn't be covered under the plan beyond 52 weeks. And in here, they paid benefits for the first 52 weeks and then an additional period to allow him to undergo the surgeries and be better able to perform in the anti-occupation standard. So if he's totally disabled from doing any kind of work that will make him some money, and the reason is psychiatric, the plan doesn't cover it. That's the only reason that he has. Unfortunately, he's not entitled to benefits under the terms of the plan. Also excluded fibromyalgia. That's another diagnosis, that after 52 weeks, if your diagnosis, if the reason that you were disabled was due to fibromyalgia, you would not be covered under this plan. That certainly seemed unreasonable to me. Well, the plan sponsors are allowed to decide these claims, and I think that with a diagnosis. Imagine why you just eliminated something that causes all the pain. I think that the thought is sometimes, and we've seen it in the different cases, and fibromyalgia is one of those things that a doctor could say it and another doctor can disagree, and it's very difficult. They used to do that. Does the plan say no coverage for fibromyalgia? No coverage for fibromyalgia beyond 52 weeks. It's saying no coverage for degenerative joint disease. If they want to say that, they can say that, and if you want to buy the plan, you can buy the plan. Right. The plan sponsor is allowed to set the terms of the plan. Do you happen to remember the page number where the plan says no fibromyalgia, no psychiatric? I can get you a cite. If you know the page number of the excerpts, anybody knows, I'd just like to put a blue tape on it. It's my understanding, isn't it, counsel, that in both of those situations, they get 52 weeks. It's just we're talking after the 52 weeks. And that's the position that we're in here is beyond the 52 weeks. If you look at the supplemental excerpts of record 12 and I guess it carries through, I would say supplemental excerpts of record 14, you see the definition of total disability, and it provides the first 52 week and the second 52 week. And then on page 13, you see the mental illness. And then just above that, you see any condition diagnosed as or without regard to its designation is equivalent to. And then number three is fibromyalgia. And then it says shall be disregarded in the determination of total disability during the period described in two above. And the two above is the beyond 52 weeks, any occupation standard. So beyond 52 weeks, you're out of luck for attention deficit disorder, chronic fatigue syndrome, Epstein-Barr virus, infectious mononucleosis, or fibromyalgia? That's correct. Or mental illness? Yes, that's correct. Thank you. If there aren't any further questions, I think that's all that we have to say is that the record, VPA's decision ultimately was reasonable based on the record presented and the terms of the plan. Thank you. Thank you, counsel. You saved a few seconds, counsel. The disabling condition was not carpal tunnel syndrome, which was the operation. It was brachial neuritis and chronic pain syndrome. The vocational people did not say he could be a teacher. That's not one of the returned occupations. The other three occupations were in the aircraft industry, the fixed telecom, central processing line, construction business, and the shipping industry. It had nothing to do with being a microwave device engineer. And they never, VPA never denied his claim because they said it was a psychiatric claim. Never denied his claim because it was fibromyalgia. That should not be an issue here. Well, he didn't make a fibromyalgia or a psychiatric claim, did he? No, but they didn't say your symptoms are due to fibromyalgia and depression, therefore we're going to Well, I didn't ask it for that. I was thinking, suppose I think, reading this record, no reasonable person could think this man can work. And the reason that no reasonable person could think this man can work is that he's psychiatrically disabled. Well, he'd still lose. So I'm going to return a discretionary decision. Would you speak into the mic, please? I am sorry, Your Honor. I don't think that's properly before the court, Your Honor. I agree with you. I think he did not make a claim on those bases. But I don't think the court should consider it. I think the only issue is whether or not he could be terminated if all his doctors said he could only work 18 hours a week with severe restrictions and accommodations. That's the only reason. Thank you. Yes, sir. Thank you, counsel. Graber v. Hewlett-Packard is submitted. We're adjourned for the day. Any questions of counsel, Your Honor? Thank you very much, counsel. Thank you. Thank you. I'm going to let you go through. You've got a big box. I've got to get myself some wheels.
judges: Hug, Kleinfeld, Smith